IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

SUPRIYA GOYAL, M.D.,                       *

     Plaintiff,                           *

        v.                                 *          CIVIL NO.: WDQ-08-0020

THERMAGE, INC.,                            *

     Defendant.                           *

*    *    *    *    *    *    *    *    *    *    *    *    *

## MEMORANDUM OPINION

Dr. Supriya Goyal Bellew[1] sued Thermage, Inc. ("Thermage") for negligence and strict products liability.  On September 29, 2011, a jury awarded Bellew $3 million.  For the following reasons, Thermage's motion for post-trial relief will be granted in part and denied in part.[2]

---

[1] Consistent with its past opinions, the Court will refer to the Plaintiff as "Bellew."  *See, e.g.*, ECF No. 79.

[2] The Court will grant Bellew's unopposed motion to modify the judgment, ECF No. 149, to include Solta Medical, Inc., the name by which Thermage has been known since 2009.  The Court will deny as moot Thermage's motion to stay enforcement of the judgment pending resolution of the post-trial motions, ECF No. 147.  Bellew told the Court that she would not begin enforcement until the motions were resolved.  *See* ECF No. 150.

I. Background[3]

On September 1, 2004, Bellew began working at the Maryland Laser, Skin, and Vein Institute ("MLSVI") as a cosmetic dermatology research fellow.  Supriya Goyal Bellew Dep. 90:17-91:3, March 12, 2009.  Within her first month at MLSVI, Bellew began treating patients with the ThermaCool, a device developed by Thermage to reduce the signs of aging in skin. *Id.* 124:3-16. The ThermaCool device has a handheld component, which the operator holds to the patient's skin while pressing a manual button or a foot pedal to deliver radio frequency pulses. *Id.* 111:8-112:5, 135:4-7.

On January 2, 2008, Bellew sued Thermage for negligence and strict products liability, alleging that the ThermaCool was defective, Thermage should have warned about the device's defect, and the company's failure to warn and develop a product without defects had caused her nerve damage.[4]

---

[3] For Thermage's motion for judgment as a matter of law, the Court will "review the entire record, disregarding all evidence favorable to [Thermage] that the jury [wa]s not required to believe." *Trademark Props., Inc. v. A&E Television Networks*, 422 F. App'x 199, 201 (4th Cir. 2011) (internal quotation marks omitted).  For the motion for new trial, the Court "may weigh the evidence and consider the credibility of witnesses." *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010).

[4] ECF No. 1.  Bellew also alleged breach of the implied warranties of merchantability and fitness for its ordinary purpose, but the Court granted Thermage summary judgment on these claims because Bellew had not brought them within the four-year statute of limitations. *See* ECF Nos. 79, 80.

Trial began on September 12, 2011.  Bellew testified that,
before she began working at MLSVI, she had only "very limited"
exposure to lasers and similar devices, and did not know how a
ThermaCool treatment took place.  Trial Tr., Vol. IV, 601:24-
602:15.  Dr. Margaret Weiss testified that she and her husband,
Dr. Robert Weiss,[5] had instructed Bellew on how to use the
ThermaCool, had seen her using the device, and had confirmed
that she was using it as intended.  Trial Tr., Vol V., 777:24-
778:1, 807:17-808:10.

Dr. Robert Weiss was an expert in ThermaCool treatments.
Bellew testified that he "had done a lot of the initial studies,
had presented a lot of his work at meetings," and "referred to
himself as one of the nation's experts . . . in Thermage."
Trial Tr., Vol. IV, 601:16-23.  Dr. Robert Weiss testified that
he had been paid by the company for speaking on its behalf at a
conference, and had trained doctors to use the ThermaCool.
Trial Tr., Vol. VI, 867:6-13.  Dr. Margaret Weiss testified that
her husband was an expert on Thermage treatments.  Trial Tr.,
Vol. V, 740:9-11.

Bellew testified that she developed pain shortly after
using the ThermaCool:

> When I started using the device, I would notice that,
> sometimes after performing the procedures, I would

---

[5] Drs. Robert and Margaret Weiss are physicians at MLSVI.  *See*
www.mdlsv.com/About-our-Practice, *last visited* July 10, 2012.

have soreness in my arm, in [my] back, [my] shoulder, those areas, and, when I took over-the-counter medications, it would go away completely.[6]

Bellew said she started taking over-the-counter pain medication because

I had mentioned to the Weisses that I was having some soreness that I noticed after doing Thermage treatments, and both Robert and Margaret told me that, yeah, it was normal, and they had experienced the same thing, and they had taken over-the-counter-pain medication, and it always went away.

Trial Tr., Vol. VII, 1240:24-1241:5.  Bellew testified that she followed the Weisses' advice because they had "taught [her] how to do the treatments." *Id.* 1241:9-16.  She assumed that her discomfort was related to "using different muscles":

[A]nytime you use new muscles, you're sore.  I mean I also bike, and, you know, when I would bike, at times my legs would feel sore, just normal soreness from using new muscles, recruiting new muscles, and you know, it would always go away while taking over-the-counter medicine, so I just thought it was normal soreness from using different muscles.

*Id.* 1242:19-1243:3.

Bellew testified that she tried to modify her posture while using the ThermaCool:

I just remember doing whatever was the most

---

[6] Trial Tr., Vol. VII, 1240:16-20.  *See also id.* 1242:8-18 ("I would get . . . soreness after performing the treatments, and then I noticed on some occasions I had some shooting pain, some cramping in my hand that would be intermittent over a few days, and I would take over-the-counter Motrin, and it would go away completely, and I would rest, and it would go away completely.").

> comfortable. Either lifting the [patient's] table, adjusting the headrest of the table, having the patient turn, or a combination of those things. Whatever would allow the most comfortable and easiest way to deliver the treatment.

Trial Tr., Vol. VII, 1258:2-6. Bellew said she sometimes used a foot pedal to deliver the treatments, but

> [f]rom what I can recall, the only way to sit and use the foot pedal would be for a very limited number of pulses because of the way that the room was set up. To use it in any more extensive way would have required moving the entire exam table where the patient was placed.

Id. 1233:5-9.

Bellew testified that, as she continued to give more ThermaCool treatments, two of her fingers "periodically bent in." Trial Tr., Vol. VII, 1243:4-7. Bellew told Drs. Robert and Margaret Weiss

> that I was having some pain and some cramping of the fingers, and, again, they told me that it was normal and nothing to worry about, and, you know, take over-the-counter Motrin, which is what they did, and I did, and it went away.

Id. 1243:18-22. Bellew testified that "[t]here was never a time when the pain didn't go away in the fall" of 2004. Id. 1244:3-6.

Bellew testified that this changed on January 4, 2005, when she gave two ThermaCool treatments and experienced "a different type of pain than [she] had ever experienced before." Trial Tr., Vol. VII, 1244:10-20.

> [W]hen I went home that day, I had burning and
> shooting pain up through my entire arm, and I had
> never had that type of pain before. Also, my elbow --
> the inside of my elbow area was red, and it was
> swollen, and it hurt. It was tender in that area, and
> I had also never experienced that before, and my
> entire right upper back, right neck area, right upper
> arm area were excruciatingly tight, like they were in
> a vise, like someone tightened a vise around them.
> They just felt hard like a rock, and I never
> experienced that type of pain and those type of
> symptoms before. I just couldn't -- just couldn't
> deal with it, couldn't tolerate it.

*Id.* 1244:19-1245:6. Bellew testified that she took over-the-

counter medicine, but the pain persisted. *Id.* 1245:7-12.

On January 4, 2005, the same day she experienced the

"different type of pain," Bellew sent an email to Drs. Margaret

and Robert Weiss:

> I'm glad that we're working on getting more help for
> [T]hermage. As we have all noticed, the handle of the
> [T]hermage machine is very poorly designed and
> conducive to developing a repetitive use injury.
>
> I have developed shooting pains and muscle spasms in
> my right hand and wrist. I was able to take NSAIDS
> for the symptoms during the [T]hermage study. The
> newer higher pulse tips, in the absence of improved
> handle design just seem to be making things worse.
>
> I am very happy to be learning and participating in
> treatments and hope we can find a solution to help
> with this.

ECF No. 148-6; Trial Tr., Vol. VII, 1246:4-23.

In a January 5, 2005 email, Bellew told Dr. Margaret Weiss

that

> I know you are very sensitive to and conscious of
> repetitive motion syndromes.

6

The next [T]hermage on my schedule at this point is
Jan[uary] 18th.  As I mentioned in my earlier e-mail,
I would be happy to be in the room supervising and
also to help in any way I can to train a[] [medical
assistant]  or  [nurse  practitioner]  to  do  the
procedure.  However, despite wanting to, I am not able
to do any more [T]hermage treatments myself until my
hand is healed and I have it evaluated.  I'm going to
schedule an appointment to see someone in orthopedics
as soon as I can.  I am concerned about nerve damage
and do not want to exacerbate the condition.  I was
unable to sleep last night due to the pain and today
it hurt to even pick up a pen and write.

I started developing the pain and paresthesias[7] from
the repetitive motion some time ago but was stoic and
continued doing [T]hermage treatments and medicating
myself.  But the symptoms are becoming worse and more
frequent.  I hope that at some point, I will be able
to resume doing [T]hermage treatments.  Until then, I
am willing to help in anyway to train other staff
members to treat the [T]hermage patients that are
already on my schedule.

Bellew testified that, at the time she had written the email,

she had not understood the nature of her injury.  Trial Tr.,

Vol. VII, 1288:17-20.

I don't think that came for several months.  I mean, I
knew I had an injury, but I -- I think, in the
beginning, I was under the impression that, you know,
it would heal over some period of time, but, as months
went by, you know, it became more apparent to me that
that wasn't going to be the case.

Id. 1289:6-13.  The jury also saw portions of Bellew's video

deposition in which she said that she knew before January 4,

2005, that the ThermaCool handle

---

[7] "Paresthesias generally refers to numbness or tingling."
Supriya Bellew Test., Trial Tr., Vol. VII, 1285:22.

7

was awkward because we had discussed it.   Did I
specifically sit around and think, gee, this Thermage
device is conducive to a repetitive motion injury?
No.   But if someone had asked me, is this possibly
conducive, [I] probably would have said yes, as are --
as [is] any laser device, as is typing, as are a whole
bunch of things.

ECF No. 148-4 at 10; Trial Tr., Vol. X, 1916:11-23.

Bellew testified that, after she experienced the "different

type of pain," she emailed Dr. Thomas Brushart, a hand surgeon

at Johns Hopkins Hospital.   Trial Tr., Vol. VII, 1259:8-11.   On

January 18, 2005, Dr. Brushart examined Bellew, tested her motor

strength, and diagnosed her with "irritation [of her] right

ulnar nerve[8] secondary to repetitive motion."   Trial Tr., Vol.

VII, 1267:19-1268:1; Medical Records, Pl.'s Opp'n, Ex. 15.   Dr.

Brushart referred Bellew to an occupational therapist for a

custom-made splint, and advised her to take ibuprofen, apply ice

and heat, and stop using the ThermaCool device.   Pl.'s Opp'n,

Ex. 15.   Dr. Brushart told Bellew that "it could take anywhere

from two to three months for complete resolution of her ulnar

nerve symptoms."   *Id.*

On January 24, 2005, Bellew told Drs. Robert and Margaret

Weiss that she "need[ed] some time with complete immobilization

of [her] arm so it [could] heal once and for all."   Pl.'s Opp'n,

Ex. 23; Trial Tr., Vol. V, 795:23-796:2.   On January 26, 2005,

---

[8] The ulnar nerve extends from the upper arm into the hand.   Beth
Murinson Test., Trial Tr., Vol. II, 238:5-7.

Bellew visited an occupational therapist and reported that her pain had begun at the "end of October."  ECF No. 148-10.

On April 26, 2005, Bellew returned to Dr. Brushart because she "wasn't getting any better."  *See* Trial Tr., Vol. II, 221:8-10, Vol. VII, 1269:21-1270:2.  During her visit, Dr. Brushart asked neurologist Dr. Beth Murinson to examine Bellew.  *Id.*  Dr. Murinson continued to see Bellew independently after that date, and found that Bellew "was essentially completely disabled by her severe pain."  Trial Tr., Vol. II, 240:10-12.  On June 14, 2005, Dr. Murinson diagnosed Bellew with "a syndrome of neuropathic pain related to her ulnar neuropathy[9] in the elbow."  *See* Trial Tr., Vol. II, 228:7-229:15.  Dr. Murinson advised Bellew to continue medication, "engage [her] arm in normal sensory exposure," and try massaging "trigger point" muscles.  *See* Pl's. Trial Ex. 226 at GOYAL:JHH:0026.  On November 15, 2005, Dr. Murinson noted that "with time[,] the conservative approach to treatment . . . [would] result in functional improvement and relief of pain."  *Id.* at GOYAL:JHH:0030.

Dr. Murinson's affidavit was admitted at trial, *see* Trial Tr., Vol. II, 299:1-5, and the jury heard portions of her deposition testimony.  Dr. Murinson stated that "[u]lnar neuropathies are typically injuries that result from a

---

[9] Neuropathy "just means disease of [the] nerve."  Beth Murinson Dep. Test., Trial Tr., Vol. II, 237:19.

cumulative stress on the ulnar nerve."  Beth Murinson Aff.,
Pl.'s Opp'n, Ex. 15 at ¶ 6.  She testified that neuropathic
injury may develop "from the use of telephones," operating a
jackhammer, using a steering wheel, or repeatedly "banging a
stapler."  Trial Tr., Vol. II, 243:8-9, 277:1-3 244:18-245:5,
415:3-12.  She also testified that numbness and parethesia could
indicate nerve injury, or simply "stress or strain on the
nerve."  Trial Tr., Vol. II, 282:18-283:3.

> [I]n ulnar neuropathy, the symptoms are sometimes
> incident to a repetitive stress or repetitive strain,
> which I view as distinct from a specific injury.

Trial Tr., Vol. II, 283:25-284:3.

Dr. Murinson stated that "[t]here is no medical evidence .
. . to prove . . . that Dr. Bellew suffered a clinically
significant, permanent injury during the initial . . . months
when she first used the Thermage device."  Murinson Aff. ¶ 7.
The pain Bellew initially suffered "may have been an indication
that the ulnar nerve was temporarily compressed," and "[m]inor
temporary compression . . . does not ordinarily result in
clinically significant injury to the nerve."  *Id.*  Dr. Murinson
opined that it was only evident in January 2005 that Bellew "had
suffered a clinically significant injury,"[10] and "in order to use

---

[10] Murinson Aff. ¶ 8.  Murinson stated that it was evident
because "Bellew's pain persisted despite not using the device."
*Id.*  Dr. Murinson testified that, since Bellew's diagnosis, the
American Academy of Neurology had come out with "specific

the Thermage device, she was engaged in bending the elbow to
such a degree that it could have contributed to an ulnar
neuropathy." Trial Tr., Vol. II, 272:19-22.

Albert Vangura, Bellew's expert engineer,[11] testified that
the ThermaCool was defective because of "the length of the cord,
the weight of the device,[12] the shape of the device, the
activation buttons, [and] the user interface." Trial Tr., Vol.
VI, 1024:10-11, 1026:2-8.

> The activation of the button and the time required to
> hold it and the postures that you require clinicians
> to be in are all part of the device. They have to be
> able to do it. The gender, the size of the people that
> are actually doing it, length of their arms, their
> strength, the room itself, and the way it's set up, so
> -- all those are part of the design of the device.
>
> . . . .
>
> So, as someone like Dr. Bellew reaches around and
> holds that device and has to hold a posture for long
> periods of time, because a lot of these treatments can
> take more than an hour and you may do multiple after
> each other, so you can be in awkward body postures
> where you're causing discomfort and pain potentially
> for people throughout the course of the treatment, and
> you can cause those awkward -- postures are well-known
> to be associated with upper extremity and even
> shoulder and neck problems, so it's the combination of

---

guidelines for defining neuropathic pain," which require
"demonstrable, clinically relevant evidence of neuropathy," such
as diagnostic tests. Trial Tr., Vol. II, 281:7-23.

[11] Vangura was qualified as an expert in "biomechanics and
bioengineering and product development," and "medical device
design process and mechanism of injury." Trial Tr. 992:19-22.

[12] The ThermaCool weighed "a little over a pound." Vangura
Test., Trial Tr., Vol. VI, 995:24-996:1.

the way in which it's used. The activation switch
itself requires that whatever position you grab the
device with, you still have to be able to activate the
device.

*Id.* 1026:23-1027:4-22.  He also testified that

in these postures, if I was to do this one time, it's
not going to hurt me, but repetitive use over and over
in an awkward posture, where you're holding a posture
for a long period of time . . . . holding your arm in
a series of awkward positions and flexing them,
activating the device . . . . [I]t's that combination
that is defective.

*Id.* 1034:21-1035:11.

Vangura testified that Thermage had breached the standard

of care by not providing a warning against repetitive motion

injury or possible neuropathy.  Trial Tr., Vol. VII, 1079:19-25,

1142:18-21.  He testified that a warning

should have demonstrated the level of risk.  It should
have--it would have been known at that time, the ways
to avoid it the--what could happen to you, what injury
could result, and then how to avoid it.

*Id.* 1080:9-13.  Vangura also testified that

[t]he device itself is kind of put out as a device
that allows you to pick any position that you want,
but that may not necessarily be good. If you chose a
position that was bad for you and it caused you pain,
that's a problem. That should be warned against, and
there should be instructions to deal with that.

*Id.* 1035:17-22.

Vangura testified that Thermage would have recognized the

risk of repetitive motion injury if it had followed industry

standards in designing and developing the ThermaCool.  Trial

12

Tr., Vol. VI, 1049:2-11.  Vangura opined that the company had

not adequately considered ergonomics and the device's potential

for injury.  Trial Tr., Vol. VI, 1036:19-1039:9.  Thermage's

risk and hazards analysis

> did not address . . . user interaction with the device
> in any way except for the potential for coming into
> contact with the grounding pad that goes underneath
> the patient, because there was a potential for shock.
> Other than that, nothing for repetitive use, nothing
> for odd postures, nothing for, you know, awkward
> postures at all.

*Id.* 1040:5-15.  Vangura testified that a clinician had reported

hand cramping from using an earlier model of the ThermaCool, and

the potential for injury "should have gone on the radar, so to

speak."  *Id.* 1041:2-1042:8.  He also testified that the company

had asked several doctors to "fire" a ThermaCool prototype "a

few times," and "10 [percent] of the people . . . . experienced

some discomfort and pain."  *Id.* 1047:8-23.

> I mean, 10 [percent] is quite a significant number of
> people that would be experiencing difficulty with
> using the device and potentially feeling pain and
> discomfort, and that's just on a couple of firings.
> Who knows what that would have been if it would have
> been more realistic and been at least one full 550
> cycles.

*Id.* 1048:1-6.  Vangura testified that a reasonable engineer

would have "[found] out more about what was the problem," but

Thermage had not done so.  *Id.* 1048:16-22.

Dr. Virginia Derebery, Thermage's expert in occupational

13

medicine,[13] opined that the ThermaCool did not "have the capacity to cause a repetitive use injury." Trial Tr., Vol. IX, 1829:16-18. She testified that nothing in Bellew's history, before January 2005, indicated a clinically significant ulnar neuropathy, and it was unclear when Bellew had suffered a clinically significant injury. *Id.* 1826:2-20. Dr. Derebery agreed with Dr. Murinson's opinions that Bellew's temporary pain in fall 2004 may have resulted from temporary compression of the ulnar nerve, and minor, temporary nerve compression does not ordinarily result in clinically-significant injury to the nerve. *Id.* 1843:12-19.

Frank Fennigkoh, Thermage's expert engineer,[14] testified that the ThermaCool's handpiece and cord could not cause ulnar neuropathy because "the design of the device itself inherently doesn't have that ability to compress the ulnar nerve at the elbow." Trial Tr., Vol. VIII, 1553:20-1554:21.

Rajiv Goyal, Bellew's brother, testified that, before January 1, 2005, his sister did not appear injured. Trial Tr.,

---

[13] Dr. Derebery was qualified as an expert in "occupational medicine, determining the cause of workplace injury, and in the assessment of delayed recovery in workplace injuries." Trial Tr., Vol. IX, 1761:16-19.

[14] Fennigkoh was qualified as an expert "in the areas of biomedical, clinical, and human factors engineering, and engineering and ergonomic evaluation of medical devices in the workplace to determine injury risk and causation." Trial Tr., Vol. VIII, 1471:2-6.

Vol. III, 450:13-16.  Goyal testified that Bellew danced at a family friend's wedding on December 18, 2004, and had no trouble picking up her toddler niece on Christmas 2004.  *Id.* 444:25-446:5, 452:14-16.

Swarn Lata Goyal, Bellew's mother, testified that her daughter was able to hold her niece at the wedding on December 18, 2004.  Trial Tr., Vol. III, 481:3-4.  She also testified that Bellew "was fine" and played with her niece on New Year's Eve 2004.  *Id.* 480:14-18.  After January 1, 2005, however, Bellew

> was complaining of a pain in the arm, and she was
> constantly saying, 'I'm hurt.  I'm hurt.  I'm hurt.'
> And I asked her how she's hurt.  She said she was
> using some machine, and there she got the injury.

*Id.* 481:11-15.  Mrs. Goyal testified that, by "the later part of February" 2005, "she was saying she's in so much . . . pain that she cannot do the household work, she cannot be on her own[.]"  *Id.* 481:18-20.  Bellew moved in with her parents in March 2005.  *Id.* 481:21-22.

The jury heard the deposition testimony of Brendan Bellew, Bellew's ex-husband,[15] who testified that his wife had complained about "severe arm pain in the fall of 2004."  Trial Tr., Vol. VII, 1215:15-16.  He said Bellew had complained about pain that "had the quality of an electric shock."  *Id.* 1216:8-10.

---

[15] The Bellews separated in April 2005 and were divorced in June 2006.  *See* Trial Tr., Vol. VII, 1213:20-1214:21.

> What I recall is she was frequently describing or
> complaining of pain in the right arm. I don't know if
> she used the exact phrase, 'repetitive motion injury.'
> I do not recall at this time if she used that phrase
> at that time.

*Id.* 1218:13-22.  Brendan Bellew testified that he "was concerned
there could be involvement of a nerve" and he "had some
suspicion that it was related to the use of that Thermage
device."  *Id.* 1222:20-21, 1223:4-5.

Dr. Margaret Weiss testified that, after taking time off to
rest her arm, Bellew returned to the office on March 22, 2005.
Trial Tr., Vol. 5, 799:8-10.  On March 30, 2005, the Weisses
fired Bellew.[16]

Bellew testified that, following her injury, she needed "a
lot of financial assistance from [her] family, because [she]
spent a year . . . out of work."  Trial Test., Vol. VII,
1313:25-1314:4.  In February 2006, she began working as a
medical dermatologist for the HMO Kaiser Permanente.  *Id.*
1316:3-4; Trial Tr., Vol. X, 2085:4-5.  Bellew testified that
she treats patients "for rashes or general skin exams, [and]
acne," but performs no excisions because she "tried a few times,

---

[16] Trial Tr., Vol. V, 804:9-20 (Margaret Weiss Test.), Vol. VII,
1302:15-1307:23 (Supriya Bellew Test.).  Dr. Margaret Weiss
testified that Bellew "[had been] unable to fulfill her duties
as a research fellow for 60 days" and had started "acting kind
of irrationally in the office" before and after she took leave.
Trial Tr., Vol. V, 800:12-801:7.  "[W]hen she was on the
different medications . . . she would cry, she would make
outbursts at the staff, [and] had some disturbing encounters
with patients."  *Id.* 801:1-3.

and every single time, it ha[d] . . . exacerbated [her] pain."
Trial Test., Vol. VII, 1316:7-18.

Bellew testified that she "had envisioned [her]self as a
cosmetic dermatologist, and . . . had pretty much spent [her]
entire life through medical school onward working toward that
goal." Trial Tr., Vol. VII, 1319:8-11. The jury learned that
Bellew had received numerous honors and had been selected as the
dermatology chief resident in her residency. Trial Tr., Vol.
IV, 555:22-25; Pl.'s Opp'n, Ex. 20 (Bellew's résumé). She also
had published nearly two dozen articles and contributed to many
research projects. *Id.* Various supervisors had commended
Bellew for her "natural talent for surgery"[17] and her "especially
exemplary" surgical skills.[18]

Bellew testified that she no longer has "dexterity" as a
surgeon because,

> with, you know, all the different symptoms I have in
> my arm, it's not there anymore, and, you know, I
> wouldn't feel comfortable, you know for instance,
> sometimes you do a procedure on the face where you
> would have to put a needle close to someone's eye, and
> I would not feel comfortable doing that at all. I
> think that would be, you know, dangerous to the
> patient.

*Id.* 1317:6-12. Bellew also testified that, in her current job,
she sometimes has to work in offices "over 20 miles from [her]

---

[17] *See* Trial Tr., Vol. IV, 604:6-9; Pl's. Opp'n, Ex. 19 at 1.

[18] *See* Trial Tr., Vol. IV, 604:6-9; Pl's. Opp'n, Ex. 19 at 3.

house"; on those days, she takes cabs to work, "[b]ecause one of the things that [she] know[s] exacerbates the pain is driving . . . long distances." *Id*. 1318:16-25.  She testified that

> I don't foresee that I'm really going to be doing any other job [in five or 10 years], because any job in private practice would require that I be doing things that I can't do.  In private practice, for example, if someone comes to your office and they have a lesion that's suspicious for skin cancer and you take a biopsy of it and it shows a skin cancer, the next step that the dermatologist would do would be to do a surgical excision to remove that, and they wouldn't refer that out to a surgeon, because they want to keep the patient and because they make a significant amount of revenue doing that surgical procedure.

> So -- but, in Kaiser, that's not the case, because Kaiser is a big HMO that employs lots of doctors. They don't lose money by me referring the patient to the Kaiser surgeon.  It doesn't cost them anything, and they're not losing money from me doing that, so it's an environment that I can work in that doesn't require a lot of accommodation for me just the way that it's set up.

*Id.* 1321:13-1322:5.  Bellew testified that her current salary at Kaiser was "362,000-something."  Trial Tr., Vol. VII, 1325:5-6.

Bellew's vocational expert, Mike Parshall, opined that, absent her injury, Bellew would have earned $207,500 in the first year of private practice, $265,000 her second year, and $425,000 her third year; by her sixth year in private practice, Parshall opined that Bellew would have earned $610,929. [19]

---

[19] Trial Tr., Vol. X, 1934:3-1935:5.  Parshall did not testify at trial.  Bellew's expert economist, Richard Edelman, testified about Parshall's findings, upon which Edelman relied in making his own calculations.  *See id.*, 1931:2-25.

Bellew's expert economist, Richard Edelman, adjusted Parshall's calculations to determine that Bellew would suffer economic damages of $6,018,951 to $6,050,975 by working at Kaiser instead of in private practice.  Trial Tr., Vol. X, 1935:21-1936:24, 1946:5-11.  Edelman testified that he had accepted Parshall's projections for the years 2005 to 2011, but had assumed that Bellew's salary from 2012 onward would increase annually about 4.41 percent, the rate of medical inflation wage growth, or 4.15 percent, the rate of professional employee wage growth.  *Id.* 1939:17-1441:10, 1982:13-21.  Edelman said that these rates were "much more conservative and produce[d] a far more reasonable result" than the figures used by Parshall.  *Id.* 1943:13-16.  He testified that

> [v]ocational experts aren't economists.  I mean, they can tell us what wage a person would have made uninjured.  They may tell us what wage a person may make injured, but the economics, going out into the future, incorporating wage growth, incorporating survival, incorporating work life, discounting back to get the present value, that's the economic side of it.

*Id.* 1943:22-1944:3.  Edelman testified that Bellew's salary at Kaiser was "a little bit better . . . than was originally indicated," and "the outlook for inflation is a lot lower than it was a year ago."  *Id.* 1948:2-9.

> We've all -- we all read the newspaper and know what's going on and have seen all the variables that have impacted on those things.

*Id.* 1948:5-7.

During cross examination, Edelman conceded that he was not
qualified to say whether Bellew's injury affected her ability to
earn an income:

> I'm just the numbers person.  I just calculate the
> value of the loss based on the numbers given to me.

Trial Tr., Vol. X, 1955:5-10.  Thermage's counsel asked Edelman
to comment on Parshall's prediction that, "in less than a year
and a half" in private practice, Bellew would have made "pretty
close to what [50 percent] of dermatologists in the country
made," and $70,000 over the mean the following year.  *Id.*
1991:24-1992:10.  Edelman responded that,

> [t]hese are not my numbers, and so I'm--I can't
> testify to his intentions or his methodology.  All I
> can do is value them.

*Id.* 1992:8-10.

Thermage's vocational expert, Dr. Jack Resnick,[20] testified
that Bellew's injury had caused no change in her earning
potential.  Trial Tr., Vol. IX, 1683:25-1684:3.

> I believe that she still has a broad set of choices of
> the types of practices that she could undertake, even
> with her injury, including the choice she's made to be
> at Kaiser, and many physicians love working at Kaiser.
> A lot of my colleagues that I know around the country
> are very happy with that choice, but there are a
> number of other practice settings, . . . and . . . I
> don't feel that they're any different before or after

---

[20] Resnick was qualified as an expert in "the analysis of
dermatology workforce and practice patterns, the economic
capacity of dermatologists and dermatology practices, and
professional career planning for dermatologists."  Trial Tr.,
Vol. IX, 1653:11-19.

her injury. Even though a couple of the doors of
specific jobs may have been closed as a result of the
injury, I don't think it affects the earning potential
at the end of the day.

*Id.* 1683:11-24.

On September 29, 2011, the jury found that Thermage was not liable to Bellew for any product malfunction or design defect. *See* Verdict Form, ECF No. 143 at 1-2. The jury found, however, that Thermage had been negligent by breaching its duty to warn about the ThermaCool's dangerous condition. *Id.* at 3-4. The jury determined that Bellew's cause of action accrued on January 18, 2005, and she had not assumed the risk of her injury. *Id.* at 4. The jury awarded Bellew $2,250,000 in economic damages and $750,000 for pain and suffering. *Id.* at 5.

On October 28, 2011, Thermage moved for judgment as a matter of law, new trial, or remittitur. ECF No. 148. On June 11, 2012, the company filed an amended memorandum in support of its motion. ECF No. 161. On June 21, 2012, Bellew opposed Thermage's motion for post-trial relief. ECF No. 176. On July 9, 2012, Thermage filed its reply.[21]

II. Analysis

Thermage argues for three forms of relief: (1) judgment as a matter of law, (2) a new trial, or (3) remittitur or a new trial on damages. *See* ECF No. 161.

---

[21] The opposition and reply were timely. *See* ECF Nos. 152, 154, 156, 158, 160 (granting more time to file briefs).

A. Judgment as a Matter of Law

"[J]udgment as a matter of law is a power to be applied sparingly and only in the most extraordinary circumstances." *Sawyer v. Asbury*, ---F. Supp. 2d---, 2012 WL 1813053, at *4 (S.D. W. Va. May 18, 2012).   Under Fed. R. Civ. P. 50, the Court may grant a motion for judgment as a matter of law only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.  *Willis v. Youngblood*, 384 F. Supp. 2d 883, 886 (D. Md. 2005).  The Court must "review the entire record, disregarding all evidence favorable to the moving party that the jury is not required to believe."  *Trademark Props., Inc. v. A&E Television Networks*, 422 F. App'x 199, 201 (4th Cir. 2011) (internal quotation marks omitted).

Thermage argues that it is entitled to judgment as a matter of law because Bellew failed to present legally sufficient evidence that (1) Thermage had a duty to warn about repetitive use injury,[22] or (2) that Thermage's failure to warn caused her injury.   ECF No. 161 at 14-21.  The company argues alternatively that Bellew failed to refute Thermage's proof that she assumed the risk of her injury and failed to sue within the statute of

---

[22] To prevail on her failure to warn claims, Bellew was required to show that Thermage owed a duty to warn about repetitive use injury, Thermage breached that duty, Bellew was injured, and Thermage's breach caused her injury. *See Higgins v. Diversey Corp.*, 998 F. Supp. 598, 604 (D. Md. 1997).  The elements are the same for negligence and strict liability claims. *Id.*

limitations.  *Id.* at 22-29.

1. Duty to Warn

"An obligation to warn may arise when . . . the [defendant] knows or should have known of product-related risks that would not be obvious to normal, reasonable users."  *Mazda Motor of Am., Inc. v. Rogowski*, 659 A.2d 391, 394 (Md. Ct. Spec. App. 1995).  "The question is not whether the particular plaintiff actually foresaw the potential danger but whether the danger was sufficiently evident that a reasonable buyer in the plaintiff's position would have foreseen it."  *Id.* at 396 (internal citation omitted).

> Whether a particular danger is obvious or patent can depend on a number of things--the complexity of the machine, the knowledge, age, background, experience, intelligence, and training of the person injured, the extent to which [her] required contact with the device is routine and repetitive, whether [s]he is subject to distractions, for example.  It necessarily is a question of fact then, and, if there is any dispute about it, the question is for the jury to decide.[23]

---

[23] *Figgie Int'l, Inc., Snorkel-Economy Div. v. Tognocchi*, 624 A.2d 1285, 1291-92 (Md. Ct. Spec. App. 1993) (internal citation omitted).  *Compare Katz v. Arundel-Brooks Concrete Corp.*, 151 A.2d 731, 733 (Md. 1959) ("We think it would be as unreasonable to require every supplier of concrete to warn of its caustic properties, as to require an electric company to warn of the danger of touching uninsulated wires.  If the danger is not patent, it is at least in the realm of common knowledge[.]"); *Mazda Motor of Am., Inc.*, 659 A.2d at 397 ("there is simply no necessity to explain that which is obvious - that seat belts do not and cannot protect the occupants of the vehicle from injury no matter how severe the accident); *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 435 (D. Md. 2000) ("because the dangers of smoking cigarettes were commonly known," cigarette manufacturers did not have a duty to

Thermage argues that "there was . . . a dearth of evidence to support the jury's verdict that the risk of repetitive use injury" from the ThermaCool "was not open and obvious to the user." ECF No. 161 at 15.  The company contends that "[i]t is common knowledge" that such an injury can arise from any repetitive motion, such as "typing, swinging a baseball bat, driving a car for long periods of time, repeatedly pressing a paper stapler, operating a jackhammer, playing a musical instrument[,] or holding a telephone to the ear for long periods of time." *Id.* at 16.  Thermage further argues that Bellew testified that she knew that the ThermaCool carried a risk of repetitive use injury, and there was no evidence that manufacturers of other hand held laser devices have issued warnings. *Id.*

Bellew counters that the ThermaCool is "not an ordinary household object such as a telephone or a baseball bat."  ECF No. 176 at 7.  She argues that the device required more than "simple repetitive motion"; her injury arose from "lifting the device up, holding it at a certain angle, pushing a button,

---

warn about the risks of smoking); *with Twombley v. Fuller Brush Co.*, 158 A.2d 110, 119 (Md. 1960) (jury should have decided whether chemicals in a new spot cleaner were a latent danger prompting a duty to warn); *Banks v. Iron Hustler Corp.*, 475 A.2d 1243, 1251 (Md. Ct. Spec. App. 1983) (manufacturer may have had a duty to warn about the risk of catching one's hand in a conveyor belt because a "jury could reasonably have found that the danger was not . . . obvious and patent").

24

working with the heavy cord, learning over the table, and doing
so repetitively for a high level of repetitions." *Id.* She
further argues that the risk of repetitive use injury could not
have been open and obvious because Thermage's witnesses denied
the very existence of such a risk. *Id.* at 8-9.

Thermage has not shown that it owed no duty to warn. The
company's witnesses testified that the ThermaCool did not cause
repetitive use injury,[24] undermining any contention that such a
risk was open and obvious, *see* ECF No. 161 at 15. Thermage's
analogy to ordinary objects is also unavailing. Although the
risk of injury from baseball bats, steering wheels, and
jackhammers arises from simple, repetitive movements, the risk
of injury from the ThermaCool arises from the "complexity of the
machine"[25]--the weight, size, and shape of the device, and the
manner in which a user must operate it. *See* Vangura Test.,
Trial Tr., Vol. VI, 1024:10-11, 1026:2-1027:22. Moreover, the
ThermaCool is not a device widely used in everyday life, and,
thus, its risks of injury are not "in the realm of common
knowledge."[26]

---

[24] *See* Trial Tr., Vol. IX, 1829:16-18 (Dr. Derebery testimony);
Trial Tr., Vol. VIII, 1553:20-1554:21 (Fennigkoh testimony).

[25] *See Figgie Int'l, Inc., Snorkel-Economy Div.*, 624 A.2d at
1291-92 ("[w]hether a particular danger is obvious" depends in
part on "the complexity of the machine").

[26] *See Katz*, 151 A.2d at 733; *see also Estate of White ex rel.*

Bellew was not required to present evidence that other manufacturers had issued warnings about similar devices. She was required only to show that Thermage knew or "should have known of product-related risks that would not be obvious to normal, reasonable users." *See Mazda Motor of Am., Inc.*, 659 A.2d at 394. Bellew met this burden with the testimony of Vangura, who opined that Thermage would have known about the ThermaCool's potential for repetitive motion injury had the company followed industry standards for designing and developing a medical device. *See* Trial Tr., Vol. VI, 1049:2-11.

In sum, Bellew presented sufficient evidence from which the jury could have reasonably concluded that (1) the risk of injury was not open and obvious, and (2) Thermage knew or should have known about the danger of repetitive use injury. Thus, Thermage is not entitled to judgment as a matter of law on this basis.

2. Causation

Thermage argues that "[e]ven if . . . the risk of repetitive use injury [was] not open and obvious, there is not one scintilla of evidence . . . that any warning would have [prevented] [Bellew's] injury." ECF No. 161 at 19.  The

---

*White*, 109 F. Supp. 2d at 435 ("the dangers of smoking cigarettes were commonly known").  Although Bellew knew that repetitive movements were "conducive to repetitive motion injury," *see* Trial Tr., Vol. VII, 1340:2-5, she testified that she did not think the ThermaCool would cause such an injury, *see* Supriya Goyal Bellew Dep., 200:5-12, March 12, 2009.

company contends that Bellew was required--and failed--to produce "competent expert evidence" to prove what a warning should have said, and that it would have prevented Bellew's injury.[27]

Bellew counters that she "was entitled to rely on the presumption that she would have heeded a legally adequate warning," and was "not required to prove the contents of [an] adequate warning." ECF No. 176 at 11. Nonetheless, she argues that Vangura testified that "an adequate warning should have demonstrated the level of risk of using the device, the ways to avoid the risk, the potential injuries that might result[,] and the ways to avoid injury." *Id.* at 12.

Maryland courts have "long recognized a presumption that plaintiffs would have heeded a legally adequate warning had one been given." *See, e.g., United States Gypsum Co. v. Mayor of Baltimore*, 647 A.2d 405, 413 (Md. 1994). "[T]his presumption may be rebutted where there is 'evidence that the personalities or dispositions of the particular [plaintiffs] were such that

---

[27] ECF No. 161 at 19-20. Thermage contends that Vangura and Dr. Murinson opined that the design or use of the ThermaCool caused Bellew's injury, not that a failure to warn caused the injury. *Id.* at 21 n.5. The company renews its argument that these causation opinions should have been excluded. *Id.* The Court denied Thermage's motion to exclude the experts' testimony, for the reasons stated in the Court's September 16, 2011 memorandum opinion. *See* ECF No. 127 at 4-13.

they clearly would have ignored warnings.'"[28]

Thermage does not cite any Maryland authority placing the burden on Bellew to draft an adequate warning. With one exception,[29] the Court is aware of no other state that applies the "heeding" presumption and requires the plaintiff to state the specific language of an adequate warning.[30]

Regardless of who bore the burden of establishing what an adequate warning would say, Bellew presented the expert testimony of Vangura, who opined that an adequate warning would have "demonstrated the level of risk" of a repetitive use injury and "ways to avoid it," including instructions on what types of postures to avoid when using the device. *See* Trial Tr., Vol. VII, 1035:17-22, 1080:9-13. Thus, the jury was not, as Thermage contends, left to rely on mere "speculation and conjecture" that

---

[28] *Waterhouse v. R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 438 (D. Md. 2005) (*quoting Eale-Picher Indus., Inc. v. Balbos*, 604 A.2d 445, 468-69 (Md. 1992)).

[29] *See Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1152 (Ind. 2003) (plaintiff must present evidence of "content or placement of a warning that would have prevented the danger posed by the alleged defect").

[30] *See Moore v. Ford Motor Co.*, 332 S.W. 3d 749, 759-60 (Mo. 2011) (plaintiff not required to show what warning would say), *citing, e.g., Bushong v. Garman Co.*, 843 S.W. 2d 807, 811 (Ark. 1992) ("Once a plaintiff proves the lack of an adequate warning or instruction, a presumption arises that the user would have read and heeded adequate warnings or instructions."); *Ayers v. Johnson & Johnson Baby Prods. Co.*, 797 P.2d 527, 531 (Wash. 1990) (plaintiffs in failure to warn case need not "prove that a specific warning was required").

a warning would have prevented Bellew's injury.  *See* ECF No. 161 at 21.

Nonetheless, Thermage insists that Bellew "had already 'heeded' what would be the most reasonably conceived warnings and nonetheless suffered her injury." ECF No. 177 at 12.  The company contends that Bellew

> admitted that she was aware of the risk of repetitive use injury, that she rested between treatments until her transient episodes subsided, that she used the foot pedal to decrease the stress of pushing the button with her finger, [and] that she changed the patients' bed height to suit her comfort[.]

*Id.* at 13.  Thermage argues that "there is no reasonable warning that would have changed any of her behavior." *Id.*

The company overlooks that "a warning can do more than exhort its audience to be careful." *Liriano v. Hobart Corp.*, 170 F.3d 264, 270 (2d Cir. 1999).  As Judge Guido Calebresi has noted, a warning "can also affect what activities the people warned choose to engage in." *Id.*

> [W]here the function of a warning is to assist the reader in making choices, the value of the warning can lie as much in making known the existence of alternatives as in communicating the fact that a particular choice is dangerous.
>
> . . . .
>
> To be more concrete, a warning can convey at least two types of messages. One states that a particular . . . activity is dangerous. Another explains that people need not risk the danger posed by such a[n] . . . activity in order to achieve the purpose for which

they might have taken that risk.[31]

The jury could have reasonably concluded that a warning would have prevented Bellew's injury in one of two ways.  First, a warning may have prompted Bellew to reduce the risk of her injury by adopting certain positions or taking more frequent-- and longer--breaks between treatments.  Although Bellew testified that she had changed her posture and taken breaks,[32] she may have extended her periods of rest, or more frequently changed her posture, had she known that she risked developing a chronic painful condition.

Second, a warning may have prompted Bellew to avoid using the product, or to stop its use after the first signs of discomfort.[33]  Although Bellew experienced pain, she assumed it was a temporary ache from using new muscles.  *See* Trial Tr., Vol. VII, 1242:19-1243:3.  Had she been warned about the risk of repetitive use or nerve injury, Bellew would have been on notice

---

[31] *Liriano*, 170 F.3d at 270.  *See also* Lewis Bass, *Products Liability: Design & Manufacturing Defects* § 10:12 (2d ed.) ("Warnings are created to fulfill a number of different purposes"; they provide "[a]n informed choice for the user," "minimize injury," and give "[a]n "exhortation . . . with the intensity required so that the user will take further steps to minimize the hazard and risk.").

[32] *See* Trial Tr., Vol. VII, 1233:5-9, 1242:8-18, 1258:2-6.

[33] *See* Restatement (Third) of Torts: Product Liability § 2, cmt. i ("Warnings alert users and consumers to the existence and nature of product risks so that they can prevent harm either by appropriate conduct during use or consumption *or by choosing not to use or consume*.") (emphasis added).

that her pain signaled a much more severe condition than mere muscle ache. Provided this information, she may have stopped further use of the ThermaCool before she developed a chronic condition.

The jury's verdict is supported by sufficient evidence that Thermage's failure to warn caused Bellew's injury. Accordingly, Thermage is not entitled to judgment as a matter of law on this basis.[34]

3. Assumption of the Risk

Thermage argues alternatively that it established a complete defense to Bellew's claims, because she failed to refute its proof that she assumed the risk of injury from using

---

[34] Thermage also argues that the failure to produce causation evidence is apparent from the "contradiction in the jury's determination that [1] the device had a condition that was unreasonably dangerous[] but . . . did not cause [Bellew's] injury and . . . [2] Thermage's failure to warn against a dangerous condition . . . cause[d] her injury." *See* ECF No. 161 at 15. The Court finds no fatal inconsistency. A product may have more than one defect, including "[t]he failure to give . . . a warning when it is required[.]" *Mazda Motor of Am., Inc.*, 659 A.2d at 394 (*quoting 3 American Law of Products Liability* § 32:2 (3d ed. 1993)). The jury may have reasonably concluded that the ThermaCool had more than one defect, but only one--the failure to warn of the risk of repetitive risk injury--caused Bellew's injury. *Cf. Mazda*, 659 A.2d at 394 ("An obligation to warn may arise when there is no defect in design or manufacture"). *See also Atl. & Gulf Stevadores, Inc. v. Ellerman Lines,* 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir. 1985) ("When a special verdict form is used and the jury's findings apparently conflict, the court has a duty to harmonize the answers, if it is possible to do so under a fair reading of them.").

the device.   ECF No. 161 at 22.

To establish the assumption of the risk defense in a products liability action, the defendant must show that the plaintiff (1) knew of and appreciated the risk of danger, (2) voluntarily confronted that risk, and (3) was unreasonable in her decision to encounter the known risk.[35]   The test of whether the plaintiff knew of, appreciated, and voluntarily confronted "the risk involved in a particular situation is an objective one . . . and ordinarily is a question to be resolved by the jury." *Morgan State Univ. v. Walker*, 919 A.2d 21, 24, 26-27 (Md. 2007) (internal citations omitted).  But, "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." *Schroyer v. McNeal*, 592 A.2d 1119, 1123 (Md. 1991).  If established, assumption of the risk is "a complete bar to recovery because 'it is a previous abandonment of the right to complain if an accident occurs.'"  *ADM P'ship*, 702 A.2d at 734 (*quoting Warner v. Markoe*, 189 A. 260, 264 (Md. 1937)).

---

[35] *Ellsworth v. Sherne Lingerie, Inc.*, 495 A.2d 348, 356 (Md. 1984).  The general test for assumption of the risk in negligence cases includes only the first two elements.  *See ADM P'ship v. Martin*, 702 A.2d 730, 734 (Md. 1997).  When this defense is used against a claim of strict liability in a products suit, the reasonableness element is added.  *See Binakonsky v. Ford Motor Co.*, 133 F.3d 281, 289 (4th Cir. 1998); *Kline v. ABCO Eng'g Corp.*, 991 F. Supp. 747, 749 (D. Md. 1997); *Sheehan v. Anthony Pools*, 440 A.2d 1085, 1092 n.11 (Md. Ct. Spec. App. 1982), *aff'd* 455 A.2d 434 (1983) (Part III adopted in full); Restatement (Second) Torts § 402A cmt. n (1965).

The jury found that Bellew had not assumed the risk of her injury. *See* Verdict Form, ECF No. 143 at 4.

Thermage argues that Bellew assumed the risk of injury by continuing to use the device after (1) "she had formed an opinion that the device was 'conducive to repetitive use injury,'" and (2) she had experienced "significant physical symptoms" that showed that she "was developing a repetitive use injury" that "would progress with further repetitive use." ECF No. 161 at 22. The company contends that Bellew's "continued use of a 'poorly designed' device 'conducive to repetitive use injuries' is assumption of the risk as a matter of law." *Id.* at 23-24.

Bellew counters that she presented evidence that "she did not *fully* appreciate the risk, and that even if she appreciated the risk of danger, her choice to continue delivering Thermage was reasonable under the circumstances." ECF No. 176 at 19 (emphasis in original).

The jury had ample evidence from which to conclude that Bellew did not assume the risk of her injury. Bellew testified that she was unfamiliar with the ThermaCool before working at MLSVI, and had been trained to use the device by Drs. Margaret and Robert Weiss. Trial Tr., Vol. IV, 601:24-602:15, Vol V., 777:24-778:1, 807:17-808:10. Bellew and Dr. Margaret Weiss testified that Dr. Robert Weiss was an expert in Thermage

33

treatments,[36] and Dr. Robert Weiss testified that he had been a paid speaker for Thermage.[37]   Bellew testified that she assumed that her initial discomfort using the ThermaCool was related to "using different muscles," in part because the Weisses had told her that the pain was normal and would disappear with rest and over-the-counter medication.   *See* Trial Tr., Vol. VII, 1240:24-1241:5, 1242:19-1243:3.   Bellew used the ThermaCool device only a few months before she experienced "a different type of pain than [she] had ever experienced before."   Trial Tr., Vol. VII, 1244:10-20.

Bellew's relative inexperience, Dr. Robert Weiss's expertise, and the Weisses' assurances that Bellew's pain was temporary explain why she did not appreciate the risk of developing a chronic nerve injury from using the ThermaCool. *See Ellsworth*, 495 A.2d at 356.   Accordingly, Thermage is not entitled to judgment as a matter of law on this basis.

4. Statute of Limitations

Thermage argues that it also proved that Bellew failed to sue within the statute of limitations.   ECF No. 161 at 24-29.

In Maryland, "[a] civil action at law shall be filed within three years from the date it accrues" unless otherwise provided

---

[36] *See* Trial Tr., Vol. IV, 601:16-23, Vol. V, 740:9-11.

[37] *See* Trial Tr., Vol. VI, 867:6-13.

by another Code provision.  Md. Code Ann., Cts. & Jud. Proc. 5-
101.[38]  To determine when a cause of action "accrues," Maryland
follows the "discovery rule," which starts the limitations
period when the plaintiff had notice of a claim.  *Pennwalt Corp.
v. Nasios*, 550 A.2d 1155, 1165 (Md. 1998).  Notice requires
actual knowledge, either express of implied, of the facts
underlying the cause of action.[39]  Accordingly, in a products
liability tort action, "the statute of limitations [does] not
begin to run until the plaintiff knows or through the exercise
of due diligence should know of injury, its probable cause, and
either manufacturer wrongdoing or product defect."  *Id.*

   "[T]he party raising a statute of limitations defense has
the burden of proving that the cause of action accrued prior to
the statutory time limit for filing the suit."  *Newell v.
Richards*, 594 A.2d 1152, 1156 (Md. 1991).  To show that a
plaintiff was on inquiry notice of her potential claim, the
defendant must prove that "(1) the plaintiff[] knew of facts
sufficient to cause a reasonable person to investigate further,

---

[38] "[T]he purpose of statutes of limitations [is] to provide
adequate time for a diligent plaintiff to bring suit as well as
to ensure fairness to defendants by encouraging the prompt
filing of claims."  *Hecht v. Resolution Trust Corp.*, 635 A.2d
394, 401 (Md. 1994).

[39] *Pennwalt*, 550 A.2d at 1160, 1165-66.  Implied actual knowledge
is "that knowledge that would in all probability have resulted
from a reasonably diligent investigation pursued upon awareness
of circumstances that would cause a reasonable person to
investigate."  *Id.* at 1160.

and (2) a diligent investigation would have revealed that the plaintiff[]" suffered injury probably caused by the defendant's wrongdoing.  *Pennwalt*, 550 A.2d at 1163-64.  "[Q]uestions of fact on which a limitations defense will turn are to be decided by the jury[.]"[40]

Because Bellew filed this suit on January 2, 2008, her tort claims must have accrued on or after January 2, 2005 to be within the limitations period.  The jury determined that Bellew knew, or should have known, of her injury on January 18, 2005, when Dr. Brushart diagnosed Bellew with "irritation [of her] right ulnar nerve secondary to repetitive motion."[41]

Thermage argues that the "the jury determined a date of injury that runs contrary to Maryland law and to the evidence and arguments presented by both parties."  ECF No. 161 at 25.  The company contends that Bellew knew, or should have known, about her repetitive use injury no later than fall 2004, when she experienced pain from using the device.  *Id.* at 25-26.  Thermage argues that Bellew testified that she considered her pain in January 2005 to be a progression of earlier symptoms;

---

[40] *O'Hara v. Kovens*, 503 A.2d 1313, 1323 (Md. 1986).  *See also Doe v. Archdiocese of Washington*, 689 A.2d 634, 639 (Md. Ct. Spec. App. 1997) ("When the viability of a statute of limitations defense hinges on a question of fact . . . the factual question is ordinarily resolved by the jury, rather than by the court.").

[41] *See* Trial Tr., Vol. VII, 1267:19-1268:1; Medical Records, Pl.'s Opp'n, Ex. 15; Verdict Form, ECF No. 143 at 4.

her ex-husband and Dr. Murinson "recognized that the symptoms were consistent with at least an irritation of the nerve," Bellew's medical records documented pain and symptoms as early as October 2004, and Bellew wrote on January 5, 2005, that she had "started developing the pain and paresthesias from the repetitive motion some time ago." *Id.* at 26-27 (emphasis omitted). Thermage contends that, "[a]s a matter of law, . . . [Bellew] was on notice that she had an injury . . . in October or November of 2004." *Id.* at 27.

Bellew counters that Dr. Murinson's testimony and affidavit established that Bellew's pain in fall 2004 did "not compel the conclusion that there ha[d] been an injury to the nerve." ECF No. 176 at 22. Bellew argues that objective medical testing is required to confirm a neuropathy, and such testing was not completed until January 18, 2005. *Id.* at 23. She also argues that her relatives testified that she had not appeared injured in December 2004, and Thermage's expert, Dr. Derebery, agreed with many of Dr. Murinson's conclusions about when Bellew's injury became clinically significant. *Id.* at 23-25.

The jury had sufficient evidence from which to conclude that Bellew's cause of action did not accrue until January 18, 2005. Although Bellew testified that she had pain in fall 2004, "[t]here was never a time when the pain didn't go away" after taking over-the-counter medicine. *See* Trial Tr., Vol. VII,

37

1243:18-22, 1244:3-6. Moreover, the Weisses said that her pain was "normal" and would subside with medication; thus, Bellew reasonably assumed that her pain was attributable to using new muscles.[42] Bellew's relatives testified that she exhibited no signs of serious pain before 2005. *See* Trial Tr., Vol. III, 450:13-16, 444:25-446:5, 452:14-16, 480:14-18, 481:3-4.

It was not until January 4, 2005, that Bellew experienced "a different type of pain than [she] had ever experienced before." Trial Tr., Vol. VII, 1244:10-20. She became "concerned about nerve damage,"[43] and confirmed her suspicions when she visited Dr. Brushart, who examined her, tested her motor strength, and diagnosed irritation of the right ulnar nerve on January 18, 2005.[44]

Dr. Murinson's testimony and affidavit further support the jury's conclusion that the statute of limitations did not begin to run until January 18, 2005. Dr. Murinson opined that [t]here

---

[42] *See* Trial Tr., Vol. VII, 1240:24-1241:5, 1242:19-1243:3; *cf. DeCroft v. Lancaster Silo Co.*, 527 A.2d 1316, 1326 (Md. Ct. Spec. App. 1987) (the issue of inquiry notice was for the jury to decide when the defendant company had made numerous assurances that there was no defect, and "an ordinary and prudent person" may not have investigated further).

[43] *See* ECF No. 148-8; Trial Tr., Vol. VII, 1288:1-19.

[44] Trial Tr., Vol. VII, 1267:19-1268:1; Medical Records, Pl.'s Opp'n, Ex. 15. Bellew did not know "for several months" more, however, that her pain would be chronic. *See* Trial Tr., Vol. VII, 1289:6-13. Indeed, Dr. Brushart expected her symptoms to be "complete[ly] resol[ved]" in "two to three months." Pl.'s Opp'n, Ex. 15.

[wa]s no medical evidence . . . to prove . . . that Dr. Bellew suffered a clinically significant, permanent injury during the initial . . . months when she first used the Thermage device." Murinson Aff. ¶ 7.  Dr. Murinson concluded that the pain Bellew initially suffered may have merely indicated that "the ulnar nerve was temporarily compressed," a condition that was not likely to lead to a significant nerve injury.  *Id.*  Dr. Derebery agreed that nothing in Bellew's history, before January 2005, indicated a clinically significant ulnar neuropathy.  Trial Tr., Vol. IX, 1826:2-1829:18.

Until Bellew knew, or should have known, that she was experiencing an injury--not merely "normal" muscle ache--she lacked actual knowledge of the facts underlying her cause of action.  *See Pennwalt*, 550 A.2d at 1160, 1165-66.  The jury reasonably concluded that Bellew did not obtain these facts until January 18, 2005.  Accordingly, Thermage is not entitled to judgment as a matter of law on this basis.

B. New Trial

Thermage argues alternatively that the Court should grant a new trial under Fed. R. Civ. P. 59(a).

In considering a motion for new trial, the Court "may weigh the evidence and consider the credibility of witnesses."  *King v. McMillan*, 594 F.3d 301, 314 (4th Cir. 2010).  If "the verdict is against the clear weight of the evidence, is based on

false evidence or will result in a miscarriage of justice," the Court must set aside the verdict and grant a new trial. *Id.* "However, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." *Pathways Psychosocial v. Town of Leonardtown*, 223 F. Supp. 2d 699, 706 (D. Md. 2002) (internal quotation marks omitted).

Thermage argues that "for all the reasons stated in [its] motion for [judgment as a matter of law], the jury's verdict is against the clear weight of the evidence." ECF No. 161 at 31. The Court disagrees.

Although Thermage's experts testified that the ThermaCool could not have caused Bellew's injury,[45] Bellew presented substantial evidence to the contrary. *See supra* Part II.A. Bellew also presented substantial evidence that she had not assumed the risk of her injury or failed to sue within the statute of limitations. *See id.* Accordingly, the jury's verdict is not against the clear weight of the evidence, and Thermage is not entitled to a new trial. *See King*, 594 F.3d at 314.

---

[45] *See* Trial Tr., Vol. VIII, 1553:20–1554:21 (Fennigkoh testimony); Trial Tr., Vol. IX, 1829:16–18 (Dr. Derebery testimony).

C. Damages

Finally, Thermage argues that the Court should order a remittitur or new trial on damages because the jury's award was "excessive." ECF No. 161 at 31-33. The company argues alternatively that the award of pain and suffering damages must be reduced according to Maryland's statutory cap on non-economic damages. *Id.* at 33-34.

1. Remittitur or New Trial

If the Court finds that a damages award is excessive, the Court may order a new trial on damages, or condition the denial of a new trial upon the plaintiff's acceptance of a remittitur.[46] Under the second approach, "the [C]ourt gives the plaintiff the option of accepting a reduced amount or trying the [issue of damages] over." *G.M. Garrett Realty, Inc.*, 17 F. App'x at 172.

Whether the jury's damages award is excessive is a matter of Maryland law.[47] In exercising its "virtually boundless" discretion,[48] the Court must consider whether the verdict is

---

[46] *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 546 (4th Cir. 2003) (internal quotation marks omitted); *G.M. Garrett Realty, Inc. v. Century 21 Real Estate Corp.*, 17 F. App'x 169, 172 (4th Cir. 2001).

[47] *See Gasperini v. Ctr. For Humanities*, 518 U.S. 415, 426-31 (1996) (in diversity case, state law controls whether verdict is excessive); *Stamathis v. Flying J, Inc.*, 389 F.3d 429, 438 (4th Cir. 2004) (same).

[48] *Exxon Mobil Corp. v. Ford*, 40 A.3d 514, 534 (Md. Ct. Spec. App. 2012) (en banc).

"'grossly excessive,' or 'shocks the conscience of the [C]ourt,'
or is 'inordinate' or 'outrageously excessive,' or even simply
'excessive.'" *Exxon Mobil Corp.*, 40 A.3d at 534 (*quoting
Banegura v. Taylor*, 541 A.2d 969, 976 (Md. 1988)). "The trial
court should extend the fullest consideration possible to the
amount returned by the jury before it concludes that the verdict
is excessive." *Adams v. Morris*, 706 F. Supp. 2d 632, 638 (D.
Md. 2010).

Thermage argues that it is entitled to a new trial on
damages because the jury's economic damages award "is without
any explanation in the evidence, and appears to be an
unsupported compromise" to award Bellew half the economic
damages she requested.[49] Thermage contends that "the clear
weight of the evidence . . . goes against the jury verdict for
economic damages" because Bellew "is currently earning the same
wage as an average dermatologist, in contradiction to [her]
expert's assumption that she could only generate" half the
revenue of the average dermatologist. *Id.* at 33. Thermage
argues alternatively that the Court should order a remittitur
reducing economic damages to $0 because Bellew will receive
$650,000 in non-economic damages, *see infra* Part II.C.2, and she

---

[49] ECF No. 161 at 32. Edelman had opined that Bellew was
entitled to economic damages of $6,018,951 to $6,050,975. *See*
Trial Tr., Vol. X, 1946:5-11. The jury awarded $3 million:
$2,250,000 in economic damages, and $750,000 for pain and
suffering. *See* Verdict Form, ECF No. 143 at 5.

"has not sought medical care in over six years, produced no medical evidence that she has a permanent injury[,] and has successfully returned to work in her chosen profession of dermatology." *Id.* at 33.

Bellew counters that "the jury's award . . . is well supported by the evidence," which included Edelman's lengthy testimony about how he calculated her economic damages, Parshall's report, Bellew's résumé, and letters of recommendation that "demonstrated [Bellew's] potential to be an exceptionally fine cosmetic surgeon." ECF No. 176 at 29-30. She contends that "[t]he fact that . . . Edelman provided a range of damages . . . in no way prevent[ed] the jurors from awarding a different amount of economic damages." *Id.* at 30. She further argues that the Court should deny Thermage's motion for remittitur because the company "is not even attempting to calculate a reasonable . . . figure." *Id.*

The Court finds that the jury's economic damages award is not excessive. Bellew presented substantial testimony, her résumé, and letters of recommendation that demonstrated that she once had the potential to be a remarkable surgeon. *See* Trial Tr., Vol. IV, 555:22-25, 604:6-9; Pl's. Opp'n, Ex. 19 at 1, 3, Ex. 20. Bellew testified that she "had pretty much spent [her] entire life through medical school onward working toward that goal," but lost her "dexterity" as a surgeon because of her

43

injury.  Trial Tr., Vol. VII, 1317:6-12, 1319:8-11.  Edelman
opined that Bellew would likely suffer more than $6 million in
damages as a result of her injury.  *See* Trial Tr., Vol. X,
1935:21-1936:24, 1946:5-11.  The jury's economic damages award
is less than half that amount.  *See* Verdict Form, ECF No. 143 at
5.

That the jury's total damages award, including non-economic
damages, is about half what Bellew sought does not establish
that the jury's award was the result of an impermissible
compromise.[50]  "[T]he jury may simply have discredited both
parties' positions regarding the amount of a reasonable [damages
award] and independently determined that [$2,250,000] was a
reasonable amount" of economic damages.[51]  "[A] jury's verdict is
to be afforded every inference that it is proper and honest."[52]
The Court instructed the jurors that it was their "duty to

---

[50] *See Lane Constr. Corp. v. Cardinal Indus., Inc.*, 978 F.2d 1255
(table), 1992 WL 332256, at *1 (4th Cir. Nov. 13, 1992)
(rejecting the argument that "compromise, and no other rational
justification, explain[ed] the jury's award of exactly half of
the amount of damages sought") (internal quotation marks
omitted).

[51] *See Fabri v. Hartford*, 69 F. App'x 187, 193 & n.4 (4th Cir.
2003) (district court did not abuse its discretion in denying a
motion for new trial on damages when the jury had awarded less
than the amount sought but had not been "instructed that such
[an award] could be no less than the amount" the parties
advocated).

[52] *Gries v. Zimmer, Inc.*, 940 F.2d 652 (table), 1991 WL 137243,
at *10 (4th Cir. July 29, 1991).

determine what, if any, award [would] fairly compensate [Bellew] for [her] losses," and that "an award should not be based on guesswork."  Trial Tr., Vol. XII, 2337:13-21.

The jury may have reasonably concluded that $2,250,000--and no more--would "fairly compensate" Bellew for her economic losses.[53]  Edelman had calculated Bellew's damages by relying on Parshall's report, but Edelman conceded that Parshall should have been more conservative in some of his projections.  *See* Trial Tr., Vol. X, 1943:13-16.  The jury may have concluded that other aspects of Parshall's report, and Edelman's related calculations, overestimated how much Bellew's income would have increased had she not been injured.  Indeed, Edelman testified that "we all read the newspaper and know what's going on" with the economy.  *See* Trial Tr., Vol. X, 1948:5-7.  Edelman also testified that Bellew's current salary was higher than anticipated.  *Id.* 1948:2-9.  Taking into account this testimony, Bellew's relatively high income despite her injury, and the weak economy, the jury could have reasonably concluded that $2,250,000 would fairly compensate Bellew for her injury.

---

[53] *See Lane Constr. Corp.*, 1992 WL 332256, at *1 (no impermissible compromise when, *inter alia*, the court had instructed the jury that "you will have to determine the damages in this case"); *Gries*, 1991 WL 137243, at *11 (verdict of "precisely one-half the amount of requested damages" was not a compromise when, *inter alia*, "the damages evidence was not undisputed and the court's instructions left room for jury discretion").

Because the jury's damages award is not excessive, the Court will deny Thermage's motion for remittitur or a new trial on damages.

2. Non-Economic Damages Cap

The parties agree that, absent a remittitur or a new trial on damages, the Court is statutorily required to reduce the jury's award for Bellew's pain and suffering.  ECF No. 161 at 33-34; ECF No. 176 at 31-33.  Under Maryland law, non-economic damages in a personal injury lawsuit may not exceed $650,000 if the cause of action accrued after October 1, 2004, and before October 1, 2005. *See* Md. Code Ann., Cts. & Jud. Proc., § 11-108(b).[54]  For computing non-economic damages, the parties agree that Bellew's cause of action accrued on January 18, 2005; accordingly, the Court will reduce the jury's award of non-economic damages from $750,000 to $650,000.

---

[54] The statute provides that

in any action for damages for personal injury . . . in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.  The limitation on noneconomic damages . . . shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

*See* Md. Code Ann., Cts. & Jud. Proc., § 11-108(b).

III. Conclusion

For the reasons stated above, Thermage's motion for post-trial relief will be granted in part and denied in part.

___8/2/12___

Date

_____

William D. Quarles, Jr.
United States District Judge